Approved: _James Hernandez_
JASON P. HERNANDEZ/STANLEY J. OKULA, JR.
Assistant United States Attorneys

Before:   HONORABLE RONALD L. ELLIS
United States Magistrate Judge     **12 MAG   606**
Southern District of New York

- - - - - - - - - - - - - - - - - -x
                                    :   SEALED COMPLAINT
UNITED STATES OF AMERICA
                                    :   Violations of
        -v.-                            18 U.S.C. §§ 1341,
                                    :   1343, & 2
RUDY KURNIAWAN,
    a/k/a "Dr. Conti,"              :   COUNTY OF OFFENSES:
                                        NEW YORK
                                    :
                Defendant.
                                    :
- - - - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JAMES P. WYNNE, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation, and charges:

## COUNT ONE
### (Wire Fraud – Scheme to Defraud a Finance Company)

        1.   From on or about November 28, 2007, up to and
including on or about January 18, 2008, in the Southern District
of New York and elsewhere, RUDY KURNIAWAN, a/k/a "Dr. Conti,"
the defendant, willfully and knowingly, having devised and
intending to devise a scheme and artifice to defraud, and for
obtaining money or property by means of false or fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce,
writings, signs, signals, pictures, and sounds for the purpose
of executing such scheme and artifice, to wit, KURNIAWAN engaged
in a scheme to defraud a Financing Company in connection with an
application for a $3 million loan by among other things falsely
representing that his personal liabilities were approximately $7
million to $8 million, when KURNIAWAN's true liabilities from

undisclosed loans were at least approximately $11,485,056.20 above what KURNIAWAN had represented.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT TWO
(Wire Fraud — Scheme to Defraud the
Finance Company and a New York Auction House)

2.   From on or about May 2, 2008, up to and including on or about May 15, 2008, in the Southern District of New York and elsewhere, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KURNIAWAN engaged in a scheme to defraud the Finance Company and a New York Auction House by pledging, by means of an interstate facsimile into the Southern District of New York, 18 artworks to the New York Auction House as security for millions of dollars of outstanding debts owed by KURNIAWAN after KURNIAWAN had previously pledged those same 18 artworks to the Finance Company to secure a $3 million loan, as set forth in Count One, without the prior knowledge and consent of the Finance Company and the New York Auction House.

(Title 18, United States Code, Sections 1343 and 2.)

COUNT THREE
(Wire Fraud — Attempt to Sell Encumbered
Wines At An International Auction House)

3.   From in or about November 2008, up to and including September 11, 2009, in the Southern District of New York and elsewhere, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, KURNIAWAN sent an interstate facsimile and sent and caused to be sent interstate email messages in order to consign wines for sale at an auction conducted by an International Auction House in the Southern District of New York without the knowledge or consent of the New York Auction House, which had a prior security interest in the consigned wines, and without disclosing to a California wine collector to whom KURNIAWAN owed money, and to whom KURNIAWAN had promised the proceeds from the auction, that the New York Auction House had a prior lien on all of KURNIAWAN's wines.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
(Mail Fraud - Attempt to Sell Counterfeit Domaine Ponsot Wines)

4.    From in or about June 2007, up to and including April 25, 2008, in the Southern District of New York and elsewhere, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, KURNIAWAN consigned for sale at the New York Auction House, approximately 84 bottles of wine purportedly from Domaine Ponsot that KURNIAWAN knew were counterfeit, for the purpose of executing such scheme and artifice and attempting to do so, placed and caused to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carrier, and knowingly caused such matters and things to be delivered by mail and by such carrier according to the direction thereon and at the place at which it was directed to be delivered, to wit, KURNIAWAN caused catalogues containing a description of the counterfeit Domaine Ponsot wines to be mailed into and out of the Southern District of New York.

(Title 18, United States Code, Sections 1341 and 2.)

COUNT FIVE
(Mail Fraud — Scheme to Defraud By Selling
Encumbered Wines At A London Auction and Attempt to
Sell Counterfeit Domaine de la Romanée-Conti Wines)

5.    From in or about November 2011, up to and including on
or about February 8, 2012, in the Southern District of New York
and elsewhere, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant,
willfully and knowingly, having devised and intending to
devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent
pretenses, representations, and promises, to wit, KURNIAWAN
used a nominee to sell KURNIAWAN's wines at a London auction
without the prior knowledge and consent of the New York Auction
House, which KURNIAWAN knew he was not permitted to do;
KURNIAWAN used a nominee consignor to conceal from potential
bidders that the consigned wines belonged to KURNIAWAN; and
KURNIAWAN attempted to sell through the auction at least 78
bottles of wine purporting to be from Domaine de la Romanée-
Conti estimated to sell for approximately $736,500 that
KURNIAWAN knew were counterfeit, for the purpose of executing
such scheme and artifice and attempting to do so, placed
and caused to be placed in a post office and authorized
depository for mail matter, matters and things to be sent
and delivered by the Postal Service, and deposited and
caused to be deposited matters and things to be sent and
delivered by private and commercial interstate carrier, and
knowingly caused such matters and things to be delivered by
mail and by such carrier according to the direction thereon
and at the place at which it was directed to be delivered,
to wit, KURNIAWAN caused catalogues containing a description of
the counterfeit Domaine de la Romanée-Conti wines to be mailed
into the Southern District of New York.

(Title 18, United States Code, Sections 1341 and 2.)


The bases for my knowledge and for the foregoing
charges are, in part, as follows:

6.    I have been a Special Agent with the Federal Bureau of
Investigation since 1983.  I have been assigned to the Major
Theft Squad in the FBI's New York office since January 1987.  In
connection with my assignment to the Major Theft Squad, I
specialize in investigations concerning art, antique, and other

collectible theft and fraud, and have participated in other
investigations concerning financial crimes, mail fraud, wire
fraud, and money laundering.  From my participation in this
investigation, my conversations with law enforcement officers
and others, and my review of documents, I am familiar with the
facts and circumstances of this investigation.  Because this
affidavit is being submitted for a limited purpose, I have not
included in it everything I know about this investigation.
Where the contents of documents and the actions, conversations,
and statements of others are related herein, they are related in
substance and in part.  In the course of this investigation, I
have learned the following.

### The Defendant

7.    I have reviewed the alien file maintained by U.S.
Immigration and Customs Enforcement, formerly known as the
Immigration Naturalization Service, for RUDY KURNIAWAN, a/k/a
"Dr. Conti," the defendant, and I have learned that KURNIAWAN
was born in or about 1976 in Jakarta, Indonesia.  KURNIAWAN is a
citizen of Indonesia, and he is not, and has never been, a
citizen of the United States.  On or about November 7, 2000,
KURNIAWAN applied for asylum to the United States from
Indonesia.  On or about March 19, 2001, KURNIAWAN's application
for asylum was denied by the Immigration and Naturalization
Service, and KURNIAWAN was ordered to leave the United States.
KURNIAWAN subsequently appealed that decision.  On or about
March 25, 2003, KURNIAWAN's appeal was dismissed by the Board of
Immigration Appeals, and KURNIAWAN was ordered to leave the
United States within 30 days of March 25, 2003.  KURNIAWAN,
however, did not comply with that order.  Since at least in or
about April 2003 up to and including March 2012, KURNIAWAN has
been a resident of California and KURNIAWAN has not had legal
immigration status in the United States.

8.    I have read a newspaper article from a major
publication dated November 1, 2006.  RUDY KURNIAWAN, a/k/a "Dr.
Conti," the defendant, was the subject of that article and he
was quoted therein.  Among other things, KURNIAWAN told the
author of that article that counterfeit wines are common.
KURNIAWAN told the reporter that he learned to spot counterfeit
wines after tasting hundreds of bottles.  KURNIAWAN stated that
he studied the corks for signs of tampering, that he knew the
telling details of the labels on the bottles for all of the top
wines, and that he could spot bottle markings that do not match
that bottle's authentic labels.

9.    I have spoken to a California businessman who knows RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, professionally and socially.  The California businessman has attended various wine events with KURNIAWAN and on one occasion in or about 2005, KURNIAWAN told the California businessman that he (KURNIAWAN) could spot a counterfeit bottle of wine better than anyone else in the world.

10.    I have interviewed wine collectors who personally know RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, I have reviewed wine auction catalogues, and I have reviewed wine-related bulletin boards and blogs on the Internet.  From those sources, I have learned that KURNIAWAN is also known as "Dr. Conti" by KURNIAWAN's friends and certain oenophiles.  KURNIAWAN was referred to as "Dr. Conti" in at least one wine auction catalogue that was published in or about April 2008.  "Dr. Conti" is itself a reference to Domaine de la Romanée-Conti, which is the most exalted producer of pinot noir in Burgundy, France.  KURNIAWAN earned the nickname "Dr. Conti" because of his affinity for and his knowledge of the wines from Domaine de la Romanée-Conti.

11.    I have also read an article on a popular wine blog on the Internet dated on or about February 9, 2007.  The author of the blog interviewed RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, for the article and quoted KURNIAWAN as saying, among other things, that, "We often taste double blind [not knowing anything about the wine being tasted] and a lot of times I get pretty close, or even spot on.  But already I've had it all, it's in my memory.  If you ask me how 1911 Romanée Conti tastes, I know, I remember it." (Alterations in the original article).  KURNIAWAN also explained that he personally prefers to drink the wines of Burgundy, specifically wines from Domaine de la Romanée-Conti (abbreviated as "DRC") and Domaine Ponsot (referred to as Ponsot), stating, "I like Burgundy, and I know the producers I like: Rousseau, DRC, de Vogüé, Roumier, Ponsot, Dujac."  KURNIAWAN went on to explain why he was selling his wine:  "I sold because the wine market's [sic] hot at the moment and people are thirsty for great wine.  Like me four years ago, they're all drooling over it."

Overview of KURNIAWAN's Schemes

12.    In the course of my investigation of RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, I have learned that beginning in at least 2005, KURNIAWAN was purchasing millions of dollars

of fine and rare wine every year. KURNIAWAN's lifestyle was funded primarily by his wine sales and by loans extended to KURNIAWAN by a New York auction house, and its customers, who were wine collectors who knew KURNIAWAN. As set forth below, KURNIAWAN engaged in at least five fraud schemes.

      a.   First, in or about January 2008, KURNIAWAN fraudulently obtained a $3 million loan from a financing company by, among other things, falsely omitting on his loan application approximately $11,485,056.20 of outstanding loans.

      b.   Second, KURNIAWAN pledged 25 artworks as collateral to obtain the aforementioned $3 million loan. In or about May 2008, KURNIAWAN defrauded a New York auction house and the financing company by doubled-pledging, without the knowledge or consent of a New York auction house, 18 of the 25 artworks to the New York auction house as security for millions of dollars of loans that KURNIAWAN owed to the New York auction house and its customers.

      c.   Third, in or about the Summer and Fall of 2009, KURNIAWAN attempted to sell a portion of his wine collection to an international auction house in violation of three agreements that KURNIAWAN signed with a New York auction house that barred KURNIAWAN from selling his wine without the prior knowledge and consent of the New York auction house.

      d.   Fourth, from in or about June 2007 up to and including in or about April 2008, KURNIAWAN attempted to sell rare and expensive wines purportedly from Domaine Ponsot that KURNIAWAN knew were counterfeit.

      e.   Finally, from in or about November 2011 up to and including in or about February 2012, KURNIAWAN used a nominee to consign KURNIAWAN's wines for sale at an auction in London, in violation of three agreements he signed with the New York auction house. KURNIAWAN also attempted to sell rare and expensive wines purportedly from Domaine de la Romanée-Conti that KURNIAWAN knew were counterfeit.

### KURNIAWAN's Personal Expenses, His Desperate Push for Cash, and the Loans He Procured in 2007 and 2008

    13.  I have reviewed bank records, credit card records, and other financial records for RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant and I have learned the following.

a.   In or about 2006, KURNIAWAN sold a portion of his
wine collection at two auctions conducted a New York auction
house (the "New York Auction House") which grossed more than $35
million combined including auction premiums.   The New York
Auction House was a New York company located in New York, New
York that sold wine from a retail store and also sold fine and
rare wine at auction.   The majority of KURNIAWAN's income in
2006 was derived from selling wine at auction or in private
sales.

b.   Between approximately 2006 and June 2011,
KURNIAWAN charged approximately $16,322,170.45 to his American
Express card.[1]   The vast majority of those charges were for
purchases of consumer goods and services, such as wine,
clothing, jewelry, travel, and other goods and services.

c.   KURNIAWAN also received and spent millions of
dollars from his checking account at Wells Fargo Bank from in or
about 2006 to in or about June 2011.

14.   As set forth below, beginning at least in or about
2007, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, began to
procure millions of dollars of loans that he would later default
on.   I have reviewed bank records, credit card records, and
other financial records for KURNIAWAN.   I have also reviewed
emails sent between KURNIAWAN and others, and I have interviewed
witnesses who have loaned KURNIAWAN money.   I have learned that
RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, incurred
approximately $11,485,056.20 of loan debts in 2007 and that
KURNIAWAN failed to timely repay the majority of that debt in
subsequent years, as further described below.

15.   I have reviewed a series of emails between KURNIAWAN
and a wine collector (the "Collector") that were exchanged on or
about January 31, 2007 and on or about February 1, 2007.   I have
also interviewed the Collector and I have learned that:

a.   On January 31, 2007, KURNIAWAN sent the Collector
an email asking the Collector if he would extend a $1 million
loan to KURNIAWAN.   The Collector agreed to loan KURNIAWAN $1
million in return for $500,000 worth of rare and expensive wine
and a promise by KURNIAWAN to pay back $500,000 plus interest to
the Collector.

---

[1] KURNIAWAN received approximately $198,207.18 in credits from merchants for
returns, for example, during that period.

b.    On February 1, 2007, KURNIAWAN emailed the
Collector, and wrote the following:  "can u pls do me a favor in
the wire.  I really need the money to be there tonight and so it
has to go directly from u to this acct or i am [fu*ked] . . . .
. ."  KURNIAWAN asked the Collector to wire $700,000 to an
account in Indonesia held by one of KURNIAWAN's family members,
and $300,000 to KURNIAWAN's personal bank account at Wells Fargo
Bank.  KURNIAWAN concluded the email by telling the Collector
the following:  "i really appreciate it and u are saving my life
with this.  Its that CRUCIAL!! Pls advise if all [is ok] and
wire goin immediately!! sorry to bother u . . . ."

c.    In accordance with KURNIAWAN's instructions, the
Collector sent KURNIAWAN two wire transfers on or about February
1, 2007.  KURNIAWAN received one wire transfer for $300,000 and
KURNIAWAN's family member in Indonesia received the other wire
transfer for $700,000.  According to the Collector, since
February 1, 2007, KURNIAWAN has not paid him $500,000 in
principal from the $1 million loan, or any accruing interest,
despite repeated demands for repayment.

16.    I have reviewed a security agreement signed on or
about February 9, 2007, by RUDY KURNIAWAN, a/k/a "Dr. Conti,"
the defendant, and a Connecticut-based company.  Under the terms
of that agreement, the Connecticut-based company loaned
KURNIAWAN $2 million, which KURNIAWAN was required to repay,
plus interest and other costs.  The loan was secured by part of
KURNIAWAN's wine collection.  KURNIAWAN repaid the loan with a
series of payments from in or about November 2007 up to and
including in or about June 2008.

17.    I have reviewed emails sent by RUDY KURNIAWAN, a/k/a
"Dr. Conti," the defendant, to others.  Those emails show, as
set forth below, that in 2007 and 2008, KURNIAWAN was seeking
cash from various sources and that KURNIAWAN's creditors were
trying to get paid.

18.    On or about September 20, 2007, KURNIAWAN emailed a
fellow wine collector ("Collector-2"), asking Collector-2 for $1
million.  On or about September 20, 2007, KURNIAWAN wrote the
following to Collector-2:  "can u send a mil?"  Collector-2
wrote in response that he "can do $850k this week."  KURNIAWAN
replied, "did u manage to get the [wine] list done?  sorry to be
pressing but i am just in deep [sh*t]."

19.   On or about December 18, 2007, an overseas wine merchant ("Merchant-1") sent KURNIAWAN the following email: "RUDY, WE CAN NOT PAY OUR INVOICES WITH EMPTY PROMISES!!! THIS IS QUOTED FROM YOUR MAIL OF 23 NOVEMBER. SINCE THEN NOTHING NEW!!! 'i will get some cash somehow someway and wire u $100k Monday and then rest early dec when my deal sealed . . . .i hope that helps . . . .' I THOUGHT YOU WERE A MAN OF YOUR WORDS!!!???"

20.   In or about January 2008 and February 2008, KURNIAWAN exchanged several emails with another overseas wine merchant ("Merchant-2").  On or about February 5, 2008, Merchant-2 sent KURNIAWAN an email reminding KURNIAWAN that he owed Merchant-2 approximately 144,949 Euro, or $219,312, for wine purchases. Six days later, with no response from KURNIAWAN, Merchant-2 emailed KURNIAWAN again and wrote, in part, "really Rudy, i need money, please confirm today that You send me at least 100k." The next day, Merchant-2 wrote, in part, "Rudy, I'm really a bit disappointed I haven had any reply from You on my last several e-mails concerning payment."  On or about February 3, 2008, KURNIAWAN emailed Merchant-2 the following:  "When did you email me? This is the only email I got? I am very tight on cash till March, can you wait?"

21.   I have reviewed an Affidavit of Confession of Judgment of Rudy Kurniawan ("Affidavit") that was signed by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, on or about November 23, 2008 and filed in New York Supreme Court.  I have learned that KURNIAWAN swore before a notary public to the following facts in the Affidavit:

a.   KURNIAWAN accepted loans from the New York Auction House and its customers from in or about 2006 up to and including in or about 2008.  As security for those loans, KURNIAWAN "unconditionally granted" the New York Auction House "a security interest in works of art and fine wine . . . ." KURNIAWAN admitted that he "thereafter defaulted on the Loans, failing to pay any amounts owed despite demand" by the New York Auction House.

b.   In 2007, KURNIAWAN procured loans from the New York Auction House and its customers that amounted to

$8,485,056.20 in principal.[2]   Specifically, KURNIAWAN accepted the following loans in 2007:

| Date | Loan Amount |
| --- | --- |
| 1/22/2007 | $1,000,000 |
| 1/24/2007 | $100,000 |
| 1/29/2007 | $100,000 |
| 2/5/2007 | $2,000,000 |
| 2/20/2007 | $250,000 |
| 3/12/2007 | $250,000 |
| 3/19/2007 | $100,000 |
| 3/20/2007 | $350,000 |
| 3/26/2007 | $650,000 |
| 4/5/2007 | $100,000 |
| 4/16/2007 | $208,322.65 |
| 4/17/2007 | $700,000 |
| 7/27/2007 | $50,000 |
| 8/3/2007 | $875,000 |
| 8/3/2007 | $875,000 |
| 8/3/2007 | $875,000 |
| 10/25/2007 | $1,723.65 |

Total: $8,485,056.20

        c.    In 2008, KURNIAWAN received loans or advances of approximately $1,187,911.58 from the New York Auction House and its customers.  Of that amount, KURNIAWAN repaid approximately

[2] According to the Affidavit, KURNIAWAN also received an additional $1,000,000 in loans in two equal amounts of $500,000 on or about October 12, 2007 and on or about November 9, 2007.  The Affidavit stated that KURNIAWAN repaid those loans.

11

$67,418.95.  KURNIAWAN was in default on the balance of the 2008 loans.

d.   As specified in the Affidavit, KURNIAWAN owed the New York Auction House approximately $8,846,369.43 in principal and interest from loans or advances, approximately $967,196.28 from outstanding invoices for wine purchases, and $588,089.35 in attorneys' fees and other costs.  Added together, the "total amount due" was $10,401,655.06.

e.   As of on or about February 7, 2012, KURNIAWAN still owed approximately $3,493,052.88 of the original $10,401,655.06 judgment to the New York Auction House.

f.   In summary, in 2007, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, received at least $11,485,056.20 in loan proceeds from the Collector, the Connecticut-based company, and the New York Auction House and its customers.  In addition, KURNIAWAN received an additional $1,000,000 in loan proceeds in 2007 that he repaid that year.  In 2008, KURNIAWAN received loans or advances of approximately $1,187,911.58, of which KURNIAWAN timely repaid approximately $67,418.95, and the remainder − approximately $1,120,492.63 in principal − was in default.

## KURNIAWAN's Wine Sales to a California Wine Collector and KURNIAWAN's Subsequent Indebtedness to the California Wine Collector

22.   I have spoken to a California wine collector (the "California Collector") and I have reviewed documents provided by the California Collector.  I have learned the following.

a.   In or about the Spring of 2007, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, approached the California Collector with an offer to sell KURNIAWAN's wine to the California Collector.  KURNIAWAN gave the California Collector a list of wines to choose from.  The California Collector asked KURNIAWAN about the provenance of the wines on the list. KURNIAWAN said that he purchased the wines at auctions, from private sales, and other sources.  KURNIAWAN did not provide any invoices or receipts for the wines.  KURNIAWAN further stated that he would replace any wines that the California Collector bought, if the California Collector was dissatisfied with them.

b.   In or about May and November 2007, the California
Collector bought from KURNIAWAN what purported to be fine and
rare wines for approximately $2.2 million.  As part of these two
transactions, KURNIAWAN signed an agreement on or about August
10, 2007 with the California Collector stating that KURNIAWAN
would repurchase the wines KURNIAWAN sold to the California
Collector at fair market value if the California Collector was
unable to sell the wines "due to the lack of traceable
provenance . . . ."

c.   In or about late 2007 or early 2008, the
California Collector hosted a dinner party.  Wine service for
the dinner party was provided by professionals from the wine
department of a major auction house (the "Wine Professionals").
During the course of the evening, the California Collector was
informed by the Wine Professionals that they had tasted the
wines being offered that night and that two of the bottles were,
in their judgment, counterfeit.  Both bottles were from
KURNIAWAN.

d.   In or about 2008, the California Collector
decided to sell approximately 500 bottles of wine from his
collection.  Some of those 500 bottles were wines that the
California Collector purchased from KURNIAWAN.  The California
Collector asked a company that sells wine at auction ("Auction
House-1") to inspect the wines in his home cellar for possible
consignment at auction.  The wines were not accepted for
consignment, however, because Auction House-1 found too many
discrepancies with the bottles and labels, leading Auction
House-1 to conclude that the wines could not be represented at
auction to be what the label on the bottle purported the wine in
the bottle to be.

e.   In or about 2008, the California Collector called
KURNIAWAN.  The California Collector told KURNIAWAN that the
Wine Professionals believed that two bottles that came from
KURNIAWAN were counterfeit.  The California Collector also told
KURNIAWAN that Auction House-1 had rejected for consignment some
of the wines that KURNIAWAN sold the California Collector.
KURNIAWAN's initial response to the California Collector was in
sum and substance that sometimes the experts do not even know
what they are drinking.  The California Collector told KURNIAWAN
that he (the California Collector) wanted KURNIAWAN to
repurchase all of the wine that KURNIAWAN had sold to the
California Collector.  KURNIAWAN said that he understood.

13

f.    KURNIAWAN failed to repurchase the wines he sold to the California Collector in 2008.  The California Collector, however, still wanted KURNIAWAN to repurchase the wines so, on or about April 15, 2009, the California Collector and KURNIAWAN agreed to convert KURNIAWAN's obligation to repurchase the wines into a $2.3 million debt by executing a Note and Security Agreement.  One of the terms of the Note was that KURNIAWAN would consign at least $2.5 million worth of KURNIAWAN's wine to a particular international auction house (the "International Auction House") for an auction to be held in the Fall of 2009 and that KURNIAWAN would grant the California Collector a "first priority security interest in all wines to be sold" at that auction.  The International Auction House had offices around the world, including in New York, New York and it sold art, antiquities, wine, and other valuable items at auction.

g.    On or about May 6, 2009, the California Collector filed Uniform Commercial Code financing statements for the wines that KURNIAWAN had sold to the California Collector.

h.    On or about August 8, 2009, KURNIAWAN and the California Collector executed a Security Agreement.  The Security Agreement stated that the April 15, 2009 Note was secured by the wines that KURNIAWAN sold to the California Collector and the wines from KURNIAWAN's personal collection that KURNIAWAN planned to sell through the International Auction house in or about 2009 and 2010 (the "California Collateral").  KURNIAWAN also represented and warranted that:  KURNIAWAN had "good and marketable title to the [California Collateral], free of all claims, liens, mortgages, pledges, security interests, encumbrances or charges of any kind . . . .;" that KURNIAWAN had "taken all action necessary to obtain the approval of all appropriate persons to grant the security interest in the [California Collateral] as stated herein and to execute the terms" of the Security Agreement.  The Security Agreement also required KURNIAWAN to execute a contract with the International Auction House to sell at least $2.5 million of KURNIAWAN's wines at the International Auction House's Fall 2009 auction. KURNIAWAN was also required to notify the International Auction House that the California Collector had a "first priority security interest" in the wines to be consigned.

14

KURNIAWAN's Scheme to Obtain A
$3 Million Loan From the Financing Company

23.   I have reviewed documents from a financing company
(the "Financing Company") and I have interviewed employees of
the Financing Company about an application for a $3 million loan
made by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, and I
have learned the following.

a.   The Financing Company, a subsidiary of a major
New York-based bank, was a lender specializing in loans that
were secured by valuable collectibles, such as antiquities, art,
and fine wine.  The Financing Company's offices were located in
New York, New York.

b.   On or about November 28, 2007, KURNIAWAN
completed a Personal Financial Statement in connection with his
application for a $3 million loan from the Financing Company.
The Personal Financial Statement was a standard form used by the
Financing Company to obtain, among other things, information
about an applicant's identity, their assets, and their
liabilities.  For example, an applicant must list his or her
liabilities, such as mortgage debt, "loans from Others," and his
or her estimated tax liability.  Under the liabilities section,
KURNIAWAN declared that he had $6 million in mortgage debt and
$1 million to $2 million in estimated tax liability for the 2006
tax year.  KURNIAWAN estimated that his "total liabilities" were
about $7 to $8 million.  KURNIAWAN left the section for "loans
from Others" blank.

c.   KURNIAWAN did not disclose on the Personal
Financial Statement, or in any other manner, that he had
outstanding loans totaling approximately $11,485,056.20 from the
Collector, the Connecticut-based company, and the New York
Auction House from in or about 2006 and in or about 2007.

24.   I have spoken to an employee of the Financing Company
who told me that she spoke by telephone to RUDY KURNIAWAN, a/k/a
"Dr. Conti," the defendant, on or about December 11 and 29,
2007.  During those phone calls, KURNIAWAN answered the
Financing Company employee's questions about KURNIAWAN's
application for the $3 million loan.  During the December 29,
2007 phone call, KURNIAWAN stated that he spends $150,000
annually, excluding his mortgage payments.  In truth, KURNIAWAN
spent approximately $2,829,703.30 on his American Express credit
card in or about 2007, and approximately $2,625,521.41 in or

about 2008.  KURNIAWAN also spent millions of dollars in 2007
and 2008 through his personal checking account at Well Fargo.
KURNIAWAN estimated that his real estate taxes were about
$70,000 a year and his annual mortgage payments were between
$400,000 and $700,000 a year.  KURNIAWAN also said that he
planned to repay the loan by selling wines through auction or
privately.

     25.  I have learned from documents obtained from the
Financing Company and from interviewing an employee of the
Financing Company (the "Financing Company Employee") that RUDY
KURNIAWAN, a/k/a "Dr. Conti," the defendant, declared on the
Personal Financial Statement that his citizenship status was
"PR."  In or about December 2007, the Financing Company
Employee, who was working in the borough of Manhattan, spoke
with KURNIAWAN on the telephone to go over certain aspects of
KURNIAWAN's Personal Financial Statement.  The Financing Company
Employee asked KURNIAWAN what "PR" meant in the citizenship box.
KURNIAWAN told the Financing Company Employee that "PR" stood
for "permanent resident" and KURNIAWAN further told the
Financing Company Employee that he was applying for a green
card.[3]  KURNIAWAN did not disclose to the Financing Company
Employee that KURNIAWAN's application for asylum to the United
States had been denied in 2001, that his appeal had been denied
in 2003, and that he had been ordered to leave the United States
in 2003, as explained above in paragraph 7.

     26.  I have reviewed documents from the Financing Company
and interviewed employees of the Financing Company about an
application for a $3 million loan by RUDY KURNIAWAN, a/k/a "Dr.
Conti," the defendant, and I have learned that on or about
January 18, 2008, the Financing Company approved KURNIAWAN's
application under the following terms, among others:

     a. KURNIAWAN and the Financing Company entered into a
Security Agreement on or about January 18, 2008.  KURNIAWAN
signed the Security Agreement in the presence of a California
notary and KURNIAWAN placed his initials at the bottom of each
page of the Security Agreement.  Under the terms of the Security
Agreement, KURNIAWAN was required to pledge certain collateral
(defined as the "Collateral" in the Security Agreement),
including 25 artworks (the "Works"), for the $3 million loan.

---

[3] I also know from reviewing an application for a home mortgage that RUDY
KURNIAWAN, a/k/a "Dr. Conti," the defendant, signed on or about September 20,
2005, that KURNIAWAN falsely represented that he was a citizen of the United
States on that mortgage application.

KURNIAWAN represented that he had "good and marketable title to
the Works, free and clear of any liens, security interests,
charges, pledges, assignments" or other interests or
encumbrances, "expect for the lien of this Security Agreement."
The Security Agreement also stated that it created "a valid
security interest in favor" of the Financing Company and that
upon the filing of a "Uniform Commercial Code financing
statement," the Financing Company would have "a duly perfected
first priority security interest" in the Works and other
collateral.  KURNIAWAN also pledged that he would not "(i) sell,
assign (by operation of law or otherwise), exchange or otherwise
dispose of any of the Collateral without [the Financing
Company's] written consent, or (ii) incur, create, assume or
suffer to exist any lien, directly or indirectly, upon or with
respect to any of [KURNIAWAN's] right, title or interest in or
to any of the Collateral except for the security interest
created by this Security Agreement."

        b.    The Works that KURNIAWAN pledged as collateral to
the Financing Company in the Security Agreement were: (1)
"Untitled" by Gene Davis; (2) "Army Hospital" by Fung Ming-Chip;
(3) "Love (Red, Blue, Green)" by Robert Indiana; (4) "Shoulder
through Art (From Taiji Series)" by Ju Ming; (5) "Marilyn Monroe
v. Chairman Mao" by Kim Dong-Yoo; (6) "River" by John McCracken;
(7) "For the Worshippers – Bodhisttva)" by Noh Sang Kyoon; (8)
"My parents (Joke Painting)" by Richard Prince; (9) "Calligraphy
Erased (in 6 parts + 1 DVD)" by Qui Zhijie; (10) "Hell, Heaven"
by Ed Ruscha; (11) "Legacy Mantle (Edition 1 of 4)" by Sui
Jiango; (12) "Sunset" by Wang Chuan; (13) "Rolex" by Wang
Guangyi; (14) "The Dream of China" by Wang Jin; (15) "Beatle
Boots (Negative)" by Andy Warhol; (16) "The mythos of lost
dynasties – for b-8 pseudo-seal-script in a wrap" by Wenda Gu;
(17) "2002-10, No. 3" by Yang Shaobin; (18) "The sisters – The
Grand Family no. 7" by Zhang Xiaogang; (19) "New Dawn (#7896)"
by Marc Handleman; (20) "Acetylnucleic Acid (Spot Painting)" by
Damien Hirst; (21) "Beautiful, I pushed the Controls and Ahead
of Me Rockets Blazed, I Don't Want to be a Dead Artist Painting
(Spin Painting)" by Damien Hirst; (22) "Detail: 100 Untitled
Works in Mill Aluminum by Donald Judd, The Chinati Foundation,
Marfa, Texas, August 1993 (Edition 2 of 3) (Eberle 1993.2002)"
by Todd Eberle; (23) "Disappear 12/20/06" by Doug Aitken; (24)
"Another Night" by Jack Pierson; and (25) "Gem" by Andy Warhol.

    27.  I have reviewed bank records for an account held by
RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, at Wells Fargo
Bank and I have learned that on or about January 18, 2008, the

Financing Company sent KURNIAWAN a wire transfer from its bank account in Manhattan of approximately $1,940,000 in loan proceeds.  On or about February 28, 2008, the Financing Company sent KURNIAWAN a second via wire transfer for approximately $500,000 in loan proceeds.

**The Scheme to Double-Pledge 18 Artworks
As Collateral to The New York Auction House**

28.  I have learned the following from my review of business records obtained from the New York Auction House and the Financing Company, and from speaking to employees of the Financing Company.

a.  On or about May 2, 2008, KURNIAWAN signed a Security Agreement (Chattel Mortgage) with the New York Auction House.  On or about May 15, 2008, KURNIAWAN sent a signed copy of the Security Agreement (Chattel Mortgage) via facsimile from California to the Manhattan office of the New York Auction House's legal counsel.

b.  According to the Security Agreement (Chattel Mortgage), the purpose of the agreement was to "secure the payment of the principal of and interest on all debts owed to [the New York Auction House] and all debts owed to other persons who claim to look to [the New York Auction House] . . . for payment . . . ."  The Security Agreement (Chattel Mortgage) granted the New York Auction House "a security interest in any wine owned by [KURNIAWAN] in [his] possession or the possession of LLK Enterprises as well as the property described on Exhibit A" (the "New York Auction House Collateral").[4]  KURNIAWAN further agreed to keep the New York Auction House Collateral "free of all liens and claims whatsoever" and to "not sell, transfer, lease, or otherwise dispose of any collateral or any interest therein, except with [the New York Auction House's] prior written consent."

c.  Without the Financing Company's prior knowledge or consent, and unbeknownst to the New York Auction House, KURNIAWAN pledged to the New York Auction House 18 of the 25 Works that KURNIAWAN had previously pledged in January 2008 to the Financing Company.  Specifically, Exhibit A of the Security

---

[4] LLK Enterprises was a wine storage facility used by the New York Auction House to store wine.

18

Agreement (Chattel Mortgage) pledged Works (1) to (18) described
in paragraph 26(b).

     d.   By pledging 18 of the Works to the New York
Auction House in May 2008, KURNIAWAN violated the Security
Agreement he signed in January 2008 with the Financing Company,
which stated, in relevant part, that KURNIAWAN would not "(i)
sell, assign (by operation of law or otherwise), exchange or
otherwise dispose of any of the Collateral without [the
Financing Company's] written consent, or (ii) incur, create,
assume or suffer to exist any lien, directly or indirectly, upon
or with respect to any of [KURNIAWAN's] right, title or interest
in or to any of the Collateral except for the security interest
created by this Security Agreement."

    29.  I have reviewed documents from the Financing Company
and learned that on or about November 5, 2008, the Financing
Company sent RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, a
default notice on the $3 million dollar loan.  That letter cited
two bases for default.  First, KURNIAWAN pledged 18 of the Works
to the New York Auction House that were previously pledged to
the Financing Company, in violation of the Security Agreement.
Second, KURNIAWAN had failed to make the scheduled installment
payment of $83,333 that was due on the $3 million loan.

    30.  As explained previously in paragraph 21, on or about
November 23, 2008, KURNIAWAN signed an Affidavit in which he
confessed judgment in favor of the New York Auction House for
$10,401,655.06 stemming from KURNIAWAN's default on millions of
dollars of loans.

        KURNIAWAN's Scheme to Sell His Encumbered
     Wines Through the International Auction House

    31.  As set forth below, I have learned that RUDY
KURNIAWAN, a/k/a "Dr. Conti," the defendant, attempted to
defrauded the New York Auction House by selling valuable wines
from KURNIAWAN's wine collection without the prior knowledge or
consent of the New York Auction House as required by three
agreements that KURNIAWAN executed that are set forth below.
KURNIAWAN also defrauded the California Collector, to whom
KURNIAWAN owed approximately $2.3 million, by failing to
disclose to the California Collector that the New York Auction
House had a prior lien on all of KURNIAWAN's wine.  KURNIAWAN's
fraud was discovered by the California Collector and the New
York Auction House, and as a result of KURNIAWAN's scheme,

neither party received 100% of the auction proceeds.  Instead, the California Collector and the New York Auction House agreed to split the auction proceeds to avoid litigating the matter.

32.  I have learned from reviewing documents obtained from the New York Auction House the following.  On or about May 2, 2008, on or about November 7, 2008, and on or about November 22, 2008, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, entered into three separate agreements with the New York Auction House in which KURNIAWAN agreed not to transfer or sell any of portion of his wine collection.  The pertinent portions of the three agreements are set forth below.

    a.  As described above in paragraph 28(a)-(b), on or about May 2, 2008, KURNIAWAN signed a Security Agreement (Chattel Mortgage) with the New York Auction House that granted the New York Auction House "a security interest <u>in any wine</u> owned by [KURNIAWAN] in [his] possession or the possession of LLK Enterprises[,]" in addition to other collateral. (Emphasis added).  KURNIAWAN further agreed to keep his wines "free of all liens and claims whatsoever" and to "not sell, transfer, lease, or otherwise dispose of any collateral or any interest therein, except with [the New York Auction House's] prior written consent."

    b.  On or about November 7, 2008, KURNIAWAN signed an Amendment to Security Agreement (Chattel Mortgage) in which KURNIAWAN reaffirmed the May 2, 2008 Security Agreement (Chattel Mortgage) and agreed to additional terms.  KURNIAWAN initialed each page of the agreement.

    c.  On or about November 22, 2008, KURNIAWAN signed a Stipulated Agreement and Order with the New York Auction House.  Section Five of the Stipulated Agreement and Order stated that: "Kurniawan agrees that he will not, directly or indirectly through any other person or entity, transfer, sell, pledge, assign, hypothecate, dispose of or otherwise convey any interests in the Collateral, until after the date on which all amounts owed by Kurniawan to [the New York Auction House] under the Kurniawan Agreements, the Security Agreement and the Amended Security Agreement . . . has been paid in full" to the New York Auction House.  "Collateral," as used in the Stipulated Agreement and Order, includes "any wine owned" by KURNIAWAN, pursuant to the May 2008 Security Agreement (Chattel Mortgage).

33.   As explained above in paragraph 22(h), KURNIAWAN pledged the proceeds from the auction conducted by the International Auction House to the California Collector, without first obtaining the New York Auction House's permission, and without disclosing to the California Collector that the New York Auction House had a pre-existing lien on all of KURNIAWAN's wines.

34.   I have learned the following from reviewing documents from an International Auction House and speaking to an employee of the International Auction House.

a.   On or about July 28, 2009, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, received an email from an employee of the International Auction House.   The email thanked KURNIAWAN for consigning wines to be auctioned on or about September 12, 2009 in New York, New York.   The email included a Consignment Agreement for the wines that KURNIAWAN had selected for the auction.   The email further stated that "[p]roceeds will be paid via check to the name on the contract."   The only name on the contract was that of the defendant, "RUDY KURNIAWAN."

b.   On or about July 29, 2009, KURNIAWAN signed the Consignment Agreement with the International Auction House's office in New York, New York.   The Consignment Agreement was signed by KURNIAWAN and KURNIAWAN initialed each page. KURNIAWAN sent a signed copy of the Consignment Agreement from California to the International Auction House's office in Manhattan via facsimile.   KURNIAWAN neither sought nor obtained the prior consent of the New York Auction House to offer any wines for sale at auction through the International Auction House.

c.   Under the terms of the Consignment Agreement, KURNIAWAN consigned dozens of bottles of wine to the International Auction House for sale at auction.   The Auction House estimated that the consignment of wines would fetch between $685,900 and $981,930 at auction.[5]   The Consignment Agreement contained a section entitled "SELLER'S REPRESENTATIONS AND WARRANTIES," which stated, in pertinent part, that the "Seller," in this case KURNIAWAN, "represents and warrants that (i) Seller has the right and title to consign the Property [i.e., the consigned wines] for sale, (ii) the Property is, and

---

[5] Those estimates reflect the low and high estimates calculated for the consigned wines.

until the completion of sale by [the Auction House] . . . will be free and clear of all liens, claims and encumbrances of others or restrictions on [the International Auction House's] . . . right to offer and sell the Property . . . ."

     d.   On or about August 20, 2009, KURNIAWAN, the International Auction House, and the California Collector signed an agreement. The agreement stated, in relevant part, that in the Consignment Agreement, KURNIAWAN had "represented and warranted" to the Auction House that the wines identified in the Consignment Agreement were "free and clear of all liens." The agreement further stated that "Seller [KURNIAWAN] has since informed [the International Auction House] that [the California Collector] does hold liens on the Property. [KURNIAWAN] now represents and warrants that there are no liens on the Property other than the ones held by [the California Collector]." (Emphasis added). This amended representation was still false, however, because KURNIAWAN had granted the New York Auction House a security interest in all of KURNIAWAN's wines prior to KURNIAWAN's agreement with the California Collector.

     e.   Three weeks later, on or about September 11, 2009, KURNIAWAN signed another agreement with the International Auction House and the California Collector. The September 11, 2009 agreement included the New York Auction House as a signatory, and that agreement stated, in relevant part, that since signing the Consignment Agreement, KURNIAWAN has "informed [the International Auction House] that [the California Collector] does hold liens on the Property and that [the New York Auction House] also holds liens on the Property." (Emphasis added).

    35.   As a result of KURNIAWAN's scheme, neither the New York Auction House nor the California Collector received all of the proceeds from the auction, which totaled approximately $691,150. Instead, the New York Auction House and the California Collector split the proceeds from the auction, but the auction proceeds were not sufficient to eliminate KURNIAWAN's debts to the California Collector or the New York Auction House.

## The Scheme to Sell Counterfeit Domaine Ponsot Wines

36.   I have reviewed business records from the New York Auction House and I have learned the following.

a.   In or about June 2007, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, consigned at least 97 bottles of wine from Domaine Ponsot to the New York Auction House.   Domaine Ponsot is a family-owned winery in Burgundy, France that has produced fine wine for decades.   Those bottles were scheduled to be auctioned on or about April 25, 2008 in New York, New York. In anticipation of that auction, the New York Auction House disseminated to its customers and others located in the Southern District of New York and elsewhere, a catalogue that described the wines that would available at that auction.   Many of the catalogues were distributed by the U.S. Postal Service.   Among the wines described in the auction catalogue were 22 lots of wine made from the pinot noir grape by Domaine Ponsot (the "Ponsot Wines").

b.   The auction catalogue included photographs of some of the Ponsot Wines and a description of each of the 22 lots comprising the Ponsot Wines.   In some cases, the catalogue also contained a "tasting note," or description of the wine's characteristics by someone who had tasted the wine.

c.   For example, Lot 413 was described as a single bottle of Domaine Ponsot wine from the Clos de la Roche vineyard from the 1929 vintage.   Below the name of the producer (Domaine Ponsot, in this case) there was a brief description of the wine's condition and the word "Nicolas."   Nicolas was a company in France that, among other things, distributed wine for certain wineries.   The bottle in Lot 413 was purportedly imported into the United States from France by Nicolas, according to the catalogue.   The catalogue stated that Lot 413 was expected to be auctioned for between $14,000 and $18,000.   A photograph of Lot 413 appeared in the catalogue.

d.   Among the Ponsot Wines were twelve magnums. (A magnum is twice the size of a standard, 750 milliliter bottle of wine.)   Specifically, KURNIAWAN consigned one magnum of 1959 Clos de la Roche (lot 420), one magnum of 1962 Clos de la Roche (lot 422), one magnum of 1964 Clos de la Roche (lot 424), one magnum of 1978 Clos de la Roche (lot 428), two magnums of 1966 Clos de la Roche (lots 426 & 427), and six magnums of 1971 Clos St. Denis (lot 434).

    e. According to the auction catalogue, the low estimate for all of the Ponsot Wines was $440,500 and the high estimate was $602,000.

37. I have learned the following from my review of the New York Auction House's business records and articles in the wine press, and from speaking to others with knowledge of the auction market for rare and fine wines.

    a. The wines of Domaine Ponsot are highly collectable and are considered by many collectors and critics to be among the finest red Burgundy wines in any given vintage.

    b. Large format bottles of rare vintage wine generally fetch a higher price at auction compared to standard-sized 750 milliliter bottles. The higher prices can be attributed to a few factors. Demand for large format bottles is high because collectors tend to prize large format bottles of rare vintage wines, which increases the price of larger bottles. Some collectors believe, for example, that wine tends to age more slowly and evenly in larger format bottles. The supply of large format bottles is also low. Large format bottles of older Burgundy wines, such as wines from the 1970's and earlier, were produced in smaller quantities than standard sized bottles. In addition, as years pass, more of the wines are consumed, thus reducing the supply of wines available in the market.

    c. Certain vintages of wine, or the year in which the grapes were grown, are significantly more valuable than others based on the quality of the wine produced by the vintage. For example, all of the purported vintages of the Ponsot Wines are from vintages that are widely regarded as either very good or excellent vintages. Those vintages are 1929, 1937, 1945, 1947, 1949, 1952, 1959, 1962, 1964, 1966, 1971, and 1978.

    d. Vineyards in Burgundy have been classified according to their perceived quality. Atop the hierarchy are the "grand cru" vineyards, which account for only approximately 2% to 3% of all wine production in Burgundy, followed by "premier cru" vineyards, "village" appellations, and "regional" appellations. Burgundy's grand cru wines were considered by many collectors to be among the best wines in the world. Their relative scarcity, their high quality, and their ability to age for decades also make them among the most expensive wines in the world. All of the Ponsot Wines consigned by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, for the April 25, 2008 auction

24

were purportedly from the Clos de la Roche vineyard or the Clos
St. Denis vineyard, both of which are grand cru vineyards.

38.   I have learned the following from reviewing the New
York Auction House's business records, from reviewing articles
in the wine press, and from speaking to the Administrator for
Domaine Ponsot (the Administrator").  The Administrator was the
fourth-generation owner and operator of Domaine Ponsot.  In or
about April 2008, the Administrator was contacted by an
oenophile who had read the New York Auction House's catalogue
containing descriptions of the Ponsot Wines.  The oenophile also
sent the Administrator pictures of some of the Ponsot Wines.
The oenophile asked the Administrator to examine the Ponsot
Wines because the oenophile thought that some of the wines may
be counterfeit.  After reviewing the materials, the
Administrator placed a telephone call to the New York Auction
House and the Administrator requested that the Ponsot Wines be
withdrawn from auction.  The Administrator subsequently traveled
to New York to ensure that the Ponsot Wines would be withdrawn
from the auction, which they eventually were.

39.   I have learned from speaking to the Administrator that
at least 84 of the 97 bottles of the Ponsot Wine were
counterfeit.  The Administrator reviewed the auction catalogue,
including photos of certain of the Ponsot Wines, and the
descriptions of the Ponsot Wines in the catalogue to conclude,
for the reasons set forth below, that the wines were
counterfeit.

a.    Lot 413, which purported to be a 1929 bottle of
wine that was bottled at Domaine Ponsot, meaning the wine was
put into the bottle at the winery, could not possibly have been
bottled at Domaine Ponsot.  The reason for this is plain:
Domaine Ponsot did not begin bottling its own wine until 1934.
Lot 413 is also counterfeit because Domaine Ponsot did not begin
making wine from the Clos de la Roche vineyard until 1934, so a
1929 bottle of Domaine Ponsot Clos de la Roche is not possible.
In addition, the label appearing on the wine in Lot 413 is not
the correct label for a Domaine Ponsot wine from 1929.  The
label on the bottle in Lot 413 is the more modern label used by
Domaine Ponsot.  A photograph of Lot 413 is attached as Exhibit
A.

b.    Six lots – Lots 429, 430, 431, 432, 433, and 434
– were wines purportedly from the Clos St. Denis Vineyard that
were produced in 1945, 1949, 1959, 1962, 1966, and 1971,

respectively.  Those wines were deemed counterfeit because
Domaine Ponsot did not begin making wine from the Clos St. Denis
vineyard until 1982.  A photograph of Lot 429 is attached as
Exhibit B.

      c.   According to the auction catalogue, nine lots –
Lots 413, 415, 417, 419, 421, 422, 424, 429, and 430 – were
purportedly bottles of Domaine Ponsot wine that were sold to the
French company Nicolas.  After reviewing Domaine Ponsot's
business records, the Administrator concluded that those bottles
were counterfeit because Domaine Ponsot has never sold its wine
to Nicolas.

      d.   Several of the Ponsot Wines were sealed with wax.
For example, the following lots were sealed with wax:  Lot 413
purported to be a bottle of 1929 Clos de la Roche; Lot 417
purported to be two bottles of 1949 Clos de la Roche; Lot 419
purported to be ten bottles of 1959 Clos de la Roche; Lot 421
purported to be 12 bottles of 1962 Clos de la Roche (these
bottles were pictured in the catalogue); Lot 422 purported to be
one magnum of 1962 Clos de la Roche; Lot 429 purported to be one
bottle of 1945 Clos St. Denis; and Lot 430 purported to be one
bottle of 1949 Clos St. Denis.  The wax on those bottles was an
inexpensive wax that was not used by Domaine Ponsot.  In
addition, the color of the wax depicted in the aforementioned
Lots was not the same color as the wax that was used by Domaine
Ponsot to seal authentic bottles of Domaine Ponsot wine.

      e.   The label on the wine in Lot 414, a wine
purporting to be from 1937, was not genuine.  A photograph of
Lot 414 appeared in the catalogue.  The label on Lot 414 was the
more modern type of labels used by Domaine Ponsot.  The wine in
Lot 414, if genuine, would have been made by the Administrator's
grandfather.  A genuine Domaine Ponsot wine from 1937 would have
featured a label showing the name of the vineyard in large
lettering in the middle of the label with the vintage appearing
in much smaller font below the vineyard.  "Mise du Domaine"
would have been stamped diagonally across the bottle.  "H.
Ponsot" would appear in the bottom right of the label and
"Appellation Controlee" would appear in the upper left corner.
A genuine bottle from that vintage also would have been hand-
signed on the label by the Administrator's grandfather.  In
addition, I have seen a photograph of the wine in Lot 413.  The
bottle has been sealed by wax, but the quality and color of the
wax was inconsistent with a genuine bottle of Domaine Ponsot

wine.  The label is also crisp, clean, unblemished, and it appears inconsistent with paper that, in 2008, was 79 years old.

40.  I have reviewed a series of emails between RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, and one of KURNIAWAN's acquaintances who works in the fine wine auction business (the "Acquaintance") that I obtained pursuant to a judicially authorized search warrant for KURNIAWAN's email account.  From those emails I have learned the following.

a.  On or about March 10, 2008, more than one month before the auction with the Ponsot Wines, KURNIAWAN asked the Acquaintance to send him a photograph of a single bottle of 1934 Domaine Ponsot Clos de la Roche that was going to be auctioned on or about March 15, 2008.  The pre-auction estimate for that bottle was $880 to $1,200.  The next day, the Acquaintance told KURNIAWAN that he would get a photograph of the bottle.  On or about March 14, 2010, the Acquaintance had not yet sent the photograph and KURNIAWAN wrote to the Acquaintance, "Where's pic?"  Later that day, the Acquaintance sent KURNIAWAN two photographs of a single bottle of 1934 Domaine Ponsot Clos de la Roche.  One of those photographs is attached hereto as Exhibit C.

b.  One of the photographs was a forward-facing image of the bottle.  That photograph showed a bottle with a smooth foil capsule.  The label showed the name of the vineyard — "Clos de la Roche" - in large lettering in the middle of the label with the vintage appearing in much smaller font below the vineyard.  "Mise du Domaine" is printed diagonally across the bottle.  "H. Ponsot" appears in the bottom right of the label and "Appellation Controlee" appears in the upper left corner.  Just below the words "Mise Du," in the lower-left corner of the label, there was a signature that appears to have been made by hand.  The end of the signature appears to have been smudged by moisture.  Underneath the label, there was another label stating that Frank Schoonmaker & Company had imported the bottle.

c.  According to the Administrator, the photographs of the bottle of 1934 Domaine Ponsot Clos de la Roche that were sent to KURNIAWAN on or about March 10, 2008, depict a genuine bottle of Domaine Ponsot Wine.  The capsule, label, and importer information are consistent with a genuine bottle of 1934 Domaine Ponsot Clos de la Roche.  In addition, the Administrator identified the signature on the label as his grandfather's

signature, which would have appeared on a genuine bottle of 1934
Domaine Ponsot Clos de la Roche.

      d.   On or about March 15, 2008, the single bottle of
1934 Domaine Ponsot Clos de la Roche was sold at auction for
$22,800, more than $20,000 above the pre-auction estimate.

      41.  On or about May 16, 2008, a member of the wine press
wrote an article about the Ponsot Wines that were withdrawn from
auction on April 25, 2008.  According to that article, RUDY
KURNIAWAN, a/k/a "Dr. Conti," the defendant, was asked at an
after-auction event on or about April 25, 2008, where he
obtained the Ponsot Wines.  KURNIAWAN responded, "We try our
best to get it right, but it's Burgundy, and sometimes shit
happens."  In a phone interview ten days after the auction,
KURNIAWAN told the same journalist, "I have a pretty good idea
of where I bought them [the Ponsot Wines] from, and I will be
working directly with [the Administrator].  We want to get to
the bottom of this.  My goal is that I just want the market to
get healthy."

      42.  I have learned the following from speaking to the
Administrator and from reviewing emails between the
Administrator and RUDY KURNIAWAN, a/k/a "Dr. Conti," the
defendant.

      a.   On or about April 26, 2008, the day after the
Ponsot Wines were withdrawn from auction, the Administrator had
lunch with KURNIAWAN.  The Administrator asked KURNIAWAN where
he got the Ponsot Wines.  KURNIAWAN told the Administrator that
he was looking into it but KURNIAWAN had no helpful information
to offer about the Ponsot Wines at that meeting.

      b.   On or about May 16, 2008, the Administrator sent
KURNIAWAN an email in which they discussed meeting for dinner in
Los Angeles in July 2008.  The Administrator wrote to KURNIAWAN,
in part, "I would like to follow up on our discussion at lunch,
as I remain committed to finding whoever is the source of the
counterfeit Ponsot wines.  As you had promised, will you please
email me the information of who sold you these wines.  I will
then be responsible to deal with them."  On or about June 5,
2008, KURNIAWAN replied.  KURNIAWAN confirmed his availability
for dinner in July and then he wrote the following:  "The wines
i bought from the cellar of Pak Hendra in asia, my cell phone is
[KURNIAWAN's cell phone number] if u need any help."

c.   On or about July 17, 2008, KURNIAWAN and the Administrator met for dinner.  At that meeting, the Administrator pressed KURNIAWAN for a way to contact "Pak Hendra," the person who purportedly sold KURNIAWAN the Ponsot Wines.  KURNIAWAN, purportedly from his memory, KURNIAWAN wrote two telephone numbers on a scrap of paper and gave them to the Administrator.

d.   On or about July 18, 2008, the Administrator called the telephone numbers given to him by KURNIAWAN.  One of the telephone numbers just rang and rang with no answer on the other end.  The Administrator tried calling again later in the day with the same result.  The Administrator called the other telephone number, but no one answered it, and the Administrator heard a high pitch noise as if it was a fax line.  The Administrator subsequently placed several phone calls to KURNIAWAN to make additional inquiries about "Pak Hendra" and the two phone numbers, but KURNIAWAN never returned the Administrator's calls.

43.   I have learned from public records searches on the Internet that both telephone numbers given to the Administrator by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, are for telephones in Jakarta, Indonesia.  One of the phone numbers has been the telephone number for a regional Indonesian airline since at least in or about 2006.  According to the results of an Internet search, the other phone number is associated with a shopping mall in Jakarta known as Gajah Mada Plaza.  Based on an Internet search, I have also learned that "Pak" is not typically a proper name in Indonesia.  Instead, it is an honorific that literally means "father" but can also be used to mean "mister" or "sir."

44.   I have learned from speaking to the Administrator that in or about May 2009, the Administrator again contacted RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant.  The Administrator and KURNIAWAN had dinner in Los Angeles.  The Administrator again confronted KURNIAWAN about the counterfeit Ponsot Wines.  The Administrator demanded to know the true source of the Ponsot Wines.  KURNIAWAN agreed to send the identity of the person who sold him the Ponsot Wines by email, KURNIAWAN never sent the Administrator that email.  KURNIAWAN has since then cutoff communication with the Administrator.

## KURNIAWAN Struggles to Sell His Wines at Auction
## Under His Own Name after the Ponsot Wines Affair

45.   I have read various wine publications, including
magazine articles, blog posts, and bulletin board posts related
to the withdrawal of the Ponsot Wines and RUDY KURNIAWAN, a/k/a
"Dr. Conti," the defendant. I have also spoken to major auction
houses that sell wine and to wine collectors who buy rare and
fine wine.  I have learned that the withdrawal from auction of
the Ponsot Wines in or about April 25, 2008, and KURNIAWAN's
subsequent failure to provide the Administrator or members of
the press with the source of the Ponsot Wines, caused
considerable damage to KURNIAWAN's reputation as a source for
authentic rare and fine wine.  After the Ponsot Wines were
withdrawn, KURNIAWAN's wine collection came under increased
scrutiny from auction houses.   Purchasers and consumer of fine
and rare wines also grew skeptical of the authenticity of
KURNIAWAN's collection.  In addition, KURNIAWAN's substantial
debts to the New York Auction House were widely reported and
auction houses were aware that selling KURNIAWAN's wines without
the New York Auction House's prior permission posed a financial
risk to the auction houses.  As a result of these concerns,
certain major auction houses were hesitant to sell KURNIAWAN's
wine after the withdrawal of the Ponsot Wines, and KURNIAWAN's
ability to sell wine at auction under his own name became
increasingly difficult.

## KURNIAWAN's Scheme to Sell Encumbered Wines
## at a London Auction and His Scheme to Sell
## Counterfeit Domaine de la Romanée-Conti Wines

46.   As is further explained below, I have learned that
RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, attempted to
defraud potential bidders at a wine auction in London, United
Kingdom that was held on or about February 8, 2012 (the "London
Auction"), by using a nominee to consign KURNIAWAN's wines at
that auction, thus concealing that the wines were actually
KURNIAWAN's.   In addition, KURNIAWAN, through a nominee,
consigned at least twelve lots of wine purporting to be from
Domaine de la Romanée-Conti that were withdrawn from the auction
because the authenticity of the wines and their provenance had
been questioned by Domaine de la Romanée-Conti's U.S. and UK
agents, the Domaine itself, and others who collect Domaine de la
Romanée-Conti wines.  As is explained in paragraph 11, KURNIAWAN
is known as "Dr. Conti" because of his interest in and knowledge
of Domaine de la Romanée-Conti's wines.  Finally, KURNIAWAN

defrauded the New York Auction House by selling other wines from his collection without the New York Auction House's prior knowledge or consent.

47.   I have reviewed business records from the London Auction and I have spoken to representatives of the London Auction.   From those sources, I have learned the following.

a.   On or about February 8, 2012, a California company and a British company jointly held an auction of fine and rare wine in London.   A catalogue of the wines to be auctioned was prepared in advance of the London Auction.   The catalogue described the wines to be auctioned.   On or about January 11, 2012 and January 12, 2012, the catalogue was distributed via the United States Postal Service to potential bidders around the world, including to potential bidders residing in the Southern District of New York.

b.   The London Auction offered several lots of wine from a winery in Burgundy, France called Domaine de la Romanée-Conti ("DRC").   The wines of DRC were among the most expensive and desired wines in the world, and the catalogue for the London Auction described the DRC wines offered as the "nucleus of the sale."

48.   I have spoken to an FBI Special Agent who interviewed a resident of California who consigned wine for sale at the London Auction (the "Consignor") and I have learned the following:

a.   The Consignor has known RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, for approximately 15 years.   In or about November 2011, KURNIAWAN asked the Consignor to consign some of KURNIAWAN's wine at the London Auction under the Consignor's name.   KURNIAWAN had previously told the Consignor that KURNIAWAN could not consign wine under his (KURNIAWAN's) name.   In or about December 2011, the Consignor agreed to consign KURNIAWAN's wines under the Consignor's name, and under the name of the Consignor's son, in addition to some of the Consignor's own wines.

b.   The Consignor and KURNIAWAN agreed that the Consignor would be paid a fixed percentage of a previously determined advance on the consignment and a different fixed percentage based on the results of the auction.

31

c.   KURNIAWAN personally delivered the wines he
wanted consigned at the London Auction to the Consignor's home.
The wines were subsequently picked-up by the London Auction
coordinators in preparation for the auction.

d.   On or about February 6, 2012, after the wines had
been collected from the Consignor's home, the Consignor asked
KURNIAWAN via email for provenance information for the Burgundy
wines.  KURNIAWAN replied that he bought those wines from one
large private cellar about ten years ago and that KURNIAWAN
believed that the wines were acquired through retailers,
brokers, and auctions in the 1980's and 1990's, mostly from
Europe.  KURNIAWAN provided no further provenance information.
The Consignor also called KURNIAWAN to ask for more provenance
information.  During that conversation, KURNIAWAN told the
Consignor, in sum and substance, "it is what it is."

e.   At least twelve lots of purported DRC wine from
KURNIAWAN's cellar – consisting of 78 bottles estimated to sell
for approximately $736,500 – were withdrawn just prior to the
auction because of several anomalies with various aspects of the
labels on the bottles that would not be found on genuine DRC
bottles.

f.   Specifically, the following lots of DRC wine, all
purportedly from grand cru vineyards and acclaimed vintages,
were KURNIAWAN's wine that the Consignor agreed to consign under
the Consignor's name, which were withdrawn from the London
Auction on or about February 8, 2012 (collectively, the
"Withdrawn DRC Wines"):

- Lot 12 purported to be six magnums of 1971 DRC La
  Tâche, estimated to sell for $47,500;

- Lot 17 purported to be two magnums of 1959 DRC La
  Tâche, estimated to sell for $19,000;

- Lot 65 purported to be seven bottles of 1966 DRC
  Montrachet estimated to sell for $57,500;

- Lot 66 purported to be seven bottles of 1966 DRC
  Montrachet estimated to sell for $57,500;

- Lot 94 purported to be one magnum of 1978 DRC
  Romanée Conti estimated to sell for $10,000;

- Lot 99 purported to be twelve bottles of 1971 DRC
  Romanée Conti estimated to sell for $125,000;

- Lot 100 purported to be one magnum of 1971 DRC
  Romanée Conti estimated to sell for $20,000;

- Lot 101 purported to be three jeroboams (the
  equivalent of 6 bottles) of 1971 DRC Romanée
  Conti estimated to sell for $100,000;

- Lot 118 purported to be twelve bottles of 1966
  DRC Romanée Conti estimated to sell for $85,000;

- Lot 121 purported to be twelve bottles of 1964
  DRC Romanée Conti estimated to sell for $50,000;

- Lot 124 purported to be three magnums of 1962 DRC
  Romanée Conti estimated to sell for $55,000; and

- Lot 127 purported to be twelve bottles of 1959
  DRC Romanée Conti estimated to sell for $110,000.

g.   In addition to the Withdrawn DRC Wines, KURNIAWAN
used the Consignor to consign other wines from KURNIAWAN's
cellar that were withdrawn prior to the London Auction.   For
example, eight lots (Lots 67 to 74) of red Burgundy wine from
Domaine Comte Georges de Vogüé, estimated to sell for
approximately $153,250, were withdrawn at the request of Domaine
Comte Georges de Vogüé.

49.   I have reviewed several posts by a citizen of
California who has collected DRC wines for approximately 30
years (the "DRC Collector") to an Internet bulletin board
dedicated to wine appreciation (the "Wine Bulletin Board").
From those sources, I have learned that:

a.   On or about February 4, 2012, the DRC Collector
posted on the Wine Bulletin Board a series of detailed concerns
regarding the several DRC wines that were consigned for the
London Auction.   The DRC Collector was concerned, for the
reasons more fully set forth below, that the DRC wines might
have been consigned by RUDY KURNIAWAN, a/k/a "Dr. Conti," the
defendant, and that several of the lots purporting to be DRC
wine were in fact counterfeits based on many discrepancies found

33

on the labels, incorrect capsules on certain bottles, and a lack
of provenance information.

b.    The DRC Collector identified the following
discrepancies, among others, with the Withdrawn DRC Wines
compared to authentic examples of DRC wine:

- The labels on Lots 99, 101, 118, 121, 124, and
  127 were missing an accent mark on the word
  Romanée in the Appellation Controlée line on the
  bottle's label.    The missing accent, known as
  accent aigu, appeared on the labels of authentic
  DRC wines.    A photograph of three of the twelve
  bottles that comprise Lot 121 are attached as
  Exhibit D.

- Conversely, the labels on Lots 17, 65, 66, 99,
  118, and 121, which purported to be DRC wine
  ranging from 1959 to 1971, showed the word
  "propriétaire" in the second printed line on the
  label with an accent over the letter "e."    The
  accent mark would not appear on authentic bottles
  of DRC wine from 1959 to 1971.    It was only until
  in or about the 1976 vintage that DRC began
  adding an accent mark to the word "propriétaire."
  A photograph of Lot 17 is attached as Exhibit E.

- The wines of DRC bear serial numbers of varying
  length depending on the particular bottling.    Lot
  12 bore a four-digit serial number, but an
  authentic bottle would have a five-digit serial
  number.    Lot 65 showed a four-digit serial
  number, but an authentic example would have a
  five-digit serial number.    Lots 94 and 100 showed
  a four-digit serial number, but genuine bottles
  should have six digits.

- The bottles in Lots 65 and 66 had plain white
  foil capsules that cover the cork.    Authentic
  bottles should have a white foil capsule with a
  black band at the bottom of the capsule.

- The street address for the purported importer of
  the bottle in Lot 94 is misspelled.    Percy Fox,
  DRC's one time agent in the United Kingdom, was

located on Sackville Street, but the Percy Fox
label on Lot 94 incorrectly indicated:
Sackvilee.

- Lot 94 purported to be a magnum, but the label
  reads "75 cl" in the lower, right-hand corner,
  which is the metric equivalent of a standard-
  sized, 750 milliliter bottle. "1,50" is printed
  over the "75 cl." An authentic label would not
  show "1,50" printed over "75 cl."

- The catalogue does not have any provenance
  information about the wines.

    c.   After the DRC Collector posted his concerns to
the Wine Bulletin Board, other wine collectors, wine
professionals, and wine journalists began taking notice of the
discrepancies identified by the DRC Collector. As a result of
mounting public concern and an increasing number of questions
regarding some of the DRC wines consigned to the London Auction,
on or about February 7, 2012, the organizers of the London
Auction took the unusual step of telling a widely read wine
publication that KURNIAWAN had not consigned any wine at the
London Auction.

    50.   I have reviewed a press release from DRC's agent in
the United Kingdom (the "UK Agent") and I have reviewed a press
release from DRC's agent in the United States (the "US Agent").
From those press releases, I have learned the following.

    a.   On or about February 7, 2012, the UK Agent issued
a press release on its website. The press release stated that
the UK Agent had "very recently heard about the very significant
amount of concern being expressed in the public domain" about
certain DRC wines that were offered at the London Auction. The
press release goes on to say, in part, that, "[t]his concern,
communicated to us through trusted third parties and covered
comprehensively on [the Wine Bulletin Board] is shared by
Domaine de la Romanée-Conti. It centres largely on the alleged
consignor of some of the Domaine's wines in this sale. Further
detailed and specific concerns over labeling discrepancies of
some of the Domaine's wines have been presented" by the DRC
Collector and published on the Wine Bulletin Board.

b.   On or about February 8, 2012, the US Agent issued a press release that was substantially similar to the UK Agent's press release.

c.   On or about February 8, 2012, the London auction withdrew the Withdrawn DRC Wines.

51.   I have learned from the DRC Collector that on or about February 10, 2012, the UK Agent told the DRC Collector that the proprietors of DRC specifically agreed with the DRC Collector's observations of irregularities in the use of accent marks on the labels of certain lots of the Withdrawn DRC Wines.

52.   In addition to attempting to sell counterfeit DRC wines, RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, defrauded the New York Auction House by selling other wines from KURNIAWAN's cellar without the New York Auction House's permission.   Pursuant to three previously discussed agreements between KURNIAWAN and the New York Auction House, KURNIAWAN could not have consigned any of his wine without the prior permission and consent of the New York Auction House.   KURNIAWAN never sought nor obtained the New York Auction House's consent to consign any wine at the London Auction.

53.   I have also learned that when RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, was confronted via email just days prior to the London Auction by the Chief Executive Officer of the New York Auction House (the "CEO"), KURNIAWAN lied about his involvement in the London Auction.   According to the emails between the CEO and KURNIAWAN:

a.   On or about February 6, 2012, the CEO wrote to KURNIAWAN the following, in part:   "I got your message saying that you were going to pay me 'soon' — you promised to make a payment by the end of January.   But January has come and gone and all I am getting from you is more vague promises, but no date certain."   The next day, KURNIAWAN replied that the CEO could expect to receive $1.5 million "very very quickly."

b.   On or about February 8, 2012, the CEO wrote the following to KURNIAWAN, in part:   "I NEED TO HEAR FROM YOU ASAP. Industry blogs are swarming with reports that you have enlisted [the Consignor] to consign your wines to [the London Auction] in an auction that is scheduled for TODAY.   You know you can't do this, Rudy, without our written consent."   The same day, KURNIAWAN replied with a message asking the CEO to call him.

The CEO replied: "This is a day where I have no time for a call. I am in meeting after meeting. You need to email me with a full explanation, as to whether any of the wines are yours or if you have any arrangement in which you will receive any portion of the proceeds from the sale of the wines being auctioned."

     c.  On or about February 9, 2012, KURNIAWAN wrote: "Pls call me tomorrow. <u>This is not my consignment and no proceeds to me.</u> Your remaining 1.5mil to come soon have nothing to do with this at all. Pls have faith in me and I'll make you whole very soon. No bs. Call me anyway pls. Thx." (Emphasis added).

### Evidence of KURNIAWAN's Counterfeiting Activity

    54.  I have learned from interviewing experts in rare and fine wine and from articles in the wine press discussing wine counterfeiting techniques, the following. One technique for counterfeiting wine is to acquire an authentic, empty bottle of rare and expensive wine. The counterfeiter then fills the empty bottle with a wine that is less expensive than the wine that would be in an authentic bottle. The counterfeiter's profit is the difference between the price realized for the wine that is purportedly in the bottle according to the genuine label and the cost of the less expensive wine that is actually in the bottle. Another technique is to use a laser printer to print labels for rare and expensive wines and to affix the counterfeit labels to a less expensive bottle of wine that has been stripped of its labels. As with the prior example, the counterfeiter's profit is the difference between the lower priced wine in the bottle versus the higher price realized because the purchaser believes that the label on the bottle indicates what is inside the bottle.

    55.  I have reviewed emails sent by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, to the Wine Director and sommelier (the "Sommelier"), or wine steward, of a restaurant (the "Restaurant") in New York, New York. I have also interviewed the Sommelier and reviewed Federal Express shipping records reflecting shipments from the Restaurant to KURNIAWAN's home address. I have learned the following:

    a.  From at least in or about 2004 up to and including at least in or about May 2008, KURNIAWAN and others participated in several late-night, private tastings at the

Restaurant where they consumed scores of fine and rare wines,
such as DRC.  The Sommelier would typically pour the wines for
these gatherings.  The bill for the evenings ran into the
thousands of dollars, and KURNIAWAN would at times pay the
entire bill.

b.   Following the tastings at the Restaurant,
KURNIAWAN asked the Sommelier to send the empty bottles to
KURNIAWAN's home address in California.  In or about 2004,
KURNIAWAN received approximately five packages containing
numerous empty bottles of fine and rare wine from the Sommelier
via Federal Express.  In or about 2005, KURNIAWAN received
approximately six packages containing empty bottles of fine and
rare wine from the Sommelier via Federal Express. And in or
about 2006, KURNIAWAN received approximately seven packages
containing empty bottles of fine and rare wine from the
Sommelier via Federal Express.

c.   Initially, KURNIAWAN told the Sommelier that
KURNIAWAN had a collection of empty bottles in his garage.  On
or about October 23, 2006, KURNIAWAN sent the Sommelier an email
to remind the Sommelier to send KURNIAWAN the empty bottles from
a recent tasting at the Restaurant.  KURNIAWAN stated that he
wanted the bottles to look "original" for a photo shoot.  The
Sommelier has not seen any photographs of the empty bottles that
he had sent to KURNIAWAN.

d.   On one occasion, the Sommelier directed an
employee of the Restaurant ship a package of empty bottles to
KURNIAWAN.  The Restaurant employee did not package the empty
bottles carefully and several of the bottles were broken when
KURNIAWAN received them.  After that incident, KURNIAWAN told
the Sommelier that he (KURNIAWAN) was very upset that the
bottles were not packed correctly and that they broke in
transit.

e.   In or about the summer of 2007, the Sommelier and
the Restaurant adopted a policy of breaking bottles of rare and
expensive wine as a measure to thwart the use of authentic empty
bottles by counterfeiters.

56.   I have spoken to the owner of a popular wine blog who
interviewed RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, by
telephone in or about October 2006.  One of the topics they
discussed was counterfeit wine.  KURNIAWAN acknowledged that
authentic empty bottles of wine can be used to counterfeit wine.

KURNIAWAN did not tell the interviewer that he asked for and received multiple shipments of empty bottles of rare wine from the Sommelier. Instead, KURNIAWAN told the interviewer the following: "When I go to restaurants and drink great wines, I'm very careful to ensure that the empty bottles are trashed or the labels are marked so they can't be re-used."

57. I have reviewed emails sent by RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, to a wine collector ("Collector-3"). According to those emails, in or about late April 2007, KURNIAWAN supplied bottles of wine purporting to be from DRC for a dinner event in New York, New York. After the dinner, on or about May 1, 2007, KURNIAWAN sent Collector-3 an email to ask Collector-3 to send him (KURNIAWAN) the empty bottles of DRC from the dinner and any unopened bottles. On or about May 30, 2007, Collector-3 informed KURNIAWAN via email that the empty bottles had been shipped to KURNIAWAN's home address in California via Federal Express.

58. I have reviewed credit card and checking account records for RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant. I have also reviewed records of KURNIAWAN's purchases from art supply stores and an office supply business. From those sources, I have learned that KURNIAWAN purchased supplies which could have been used to create counterfeit wine labels and affix them to bottles. For example, in or about 2006, KURNIAWAN purchased at least three different kinds of glue. In or about 2006, KURNIAWAN purchased approximately thirteen packages of warm white Ingres drawing paper. I have reviewed descriptions on Ingres paper on the Internet and learned that Ingres paper is typically used for charcoal and pastel drawings. It is also used as endpaper in books. Ingres is often used in books because of its antique appearance. Warm white is a shade of color that Ingres paper was offered in. On or about December 15, 2007, KURNIAWAN purchased five inkpads in various colors. The inkpads are typically used to supply ink to rubber stamps.

WHEREFORE, deponent prays that a warrant issue for the arrest of the RUDY KURNIAWAN, a/k/a "Dr. Conti," the defendant, and that he be imprisoned or bailed as the case may be.


_____
JAMES P. WYNNE
Special Agent
Federal Bureau of Investigation


Sworn to before me this
5th day of March, 2012


_____
HON. RONALD L. ELLIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit A

# Exhibit B

# Exhibit C



# Exhibit D



# Exhibit E

LA TACHE

SOCIÉTÉ CIVILE DU DOMAINE DE LA ROMANEE-CONTI
PROPRIÉTAIRE A VOSNE-ROMANÉE (CÔTE-D'OR)

APPELLATION · LA TACHE · CONTROLÉE

27.775 Bouteilles Récoltées

No 02835

ANNÉE 1959

L'ASSOCIÉ-GÉRANT

H. de Villaine

Mise en bouteille au domaine

LA TACHE

SOCIÉTÉ CIVILE DU DOMAINE DE LA ROMANEE-CONTI
PROPRIÉTAIRE A VOSNE-ROMANÉE (CÔTE-D'OR)

APPELLATION · LA TACHE · CONTROLÉE

27.775 Bouteilles Récoltées

No 02833

ANNÉE 1959

L'ASSOCIÉ-GÉRANT

H. de Villaine

Mise en bouteille au domaine